## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE FISHING COMPANY OF ALASKA, INC.<br>200 West Thomas, Suite 440<br>Seattle, Washington 98119<br><br>　　　Plaintiff,<br><br>v.<br><br>THE HONORABLE CARLOS GUTIERREZ,<br>in his official capacity as the Secretary of Commerce,<br>United States Department of Commerce<br>1401 Constitution Avenue, N.W.<br>Washington, D.C. 20230,<br><br>　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
## AND PETITION FOR REVIEW OF RULEMAKING

Dated: October 15, 2007

David E. Frulla
D.C. Bar No. 414170
Shaun M. Gehan
D.C. Bar No. 483720
Daniel S. Blynn
D.C. Bar No. 488934
Kelley Drye & Warren LLP
3050 K Street, N.W. – Suite 400
Washington, D.C. 20007
Telephone: (202) 342-8400
Facsimile: (202) 342-8451


Attorneys for Plaintiff

## GLOSSARY OF TERMS

| | |
|---|---|
| **AFA** | American Fisheries Act |
| **Amendment 80 EA** | Amendment 80 Environmental Assessment/Regulatory Impact Review/Final Regulatory Flexibility Analysis |
| **APA** | Administrative Procedure Act |
| **BSAI** | Bering Sea and Aleutian Islands |
| **CDQ** | Community Development Quota |
| **Council** | North Pacific Fishery Management Council |
| **CRP** | Capacity Reduction Program |
| **FCA** | The Fishing Company of Alaska, Inc |
| **FMP** | Fishery Management Plan |
| **FRFA** | Final Regulatory Flexibility Analysis |
| **H&G CP** | Head-and-gut trawl catcher/processor |
| **ITAC** | Initial Total Allowable Catch |
| **LAPP** | Limited Access Privilege Program |
| **LLP** | License Limitation Permit |
| **MSA** | Magnuson-Stevens Fishery Conservation and Management Act |
| **NMFS** | National Marine Fisheries Service |
| **NOAA** | National Oceanic and Atmospheric Administration |
| **POP** | Aleutian Island Pacific Ocean Perch |
| **PSC** | Prohibited Species Catch |
| **QS** | Quota Share |
| **RFA** | Regulatory Flexibility Act |

## INTRODUCTION

1.      Plaintiff, The Fishing Company of Alaska, Inc. ("FCA"), brings this action to challenge the National Oceanic and Atmospheric Administration ("NOAA") and the National Marine Fisheries Service ("NMFS") final rule entitled "Fisheries of the Exclusive Economic Zone Off Alaska; Allocating Bering Sea/Aleutian Islands Fishery Resources; American Fisheries Act Sideboards" ("the Rule") set forth in the Federal Register on September 14, 2007. 72 Fed. Reg. 52668 (Sept. 14, 2007).

2.      The Rule enacts a set of regulations designed to implement a conservation and management program known as Amendment 80 to the Fishery Management Plan ("FMP") for Groundfish of the Bering Sea and Aleutian Islands ("BSAI") Management Area. Amendment 80 expands on a bycatch reduction program (*i.e.*, a program to limit the amount of fish caught but not kept for economic or regulatory reasons) first instituted by Amendment 79 to the FMP. *See Legacy Fishing Co, et al. v. Gutierrez*, No. 06-0835 (JR), 2007 WL 861143 (D.D.C. March 20, 2007) (case challenging Amendment 79), *on appeal Fishing Co. of Alaska, Inc. v. Gutierrez*, No. 07-5153 (D.C. Cir.).

3.      As explained in greater detail below, Amendment 80 also allocates certain North Pacific fish species among different regulated sectors, including that in which FCA participates, and purports to provide the opportunity for those in FCA's sector to combine efforts under a cooperative framework to more efficiently harvest stocks outside a competitive "race for fish" that encourages waste and results in uneconomic activities.

4.      Unfortunately, in designing what should have been a regulatory "win-win" situation for fishermen and fish stocks, the Secretary has illegally approved certain specific measures that run afoul of important statutory and constitutional requirements.

5.    More specifically, the Rule, promulgated under the authority of the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. § 1801-1884,[1] fails in various respects to adhere to certain National Standards for fisheries conservation and management, *see id.* § 1851(a), and other substantive provisions of the MSA, as detailed herein, while effecting a deprivation of FCA's property without due process of law.

6.    For instance, Amendment 80 sets standards for establishing a cooperative that are not based on the best available scientific information as required by National Standard 2, 16 U.S.C. § 1851(a)(2), but rather considers factors upon which the Secretary is not entitled to rely. This restrictive scheme also violates a number of other National Standards, including National Standards 5 (consideration, where practicable, of efficient utilization of fishery resources), 6 (consideration of variations and contingencies), 7 (cost minimization), 8 (minimization of adverse economic impacts), and 9 (minimization of bycatch). *Id.* (5)-(9).    Finally, these standards will also prevent FCA, for reasons explained below, from harvesting its full allocation of fish under Amendment 80, which, in and of itself, runs afoul of National Standard 1. *Id.* (1).

7.    The Rule at issue also treats the vessels in the Amendment 80 sector unfairly and inequitably with respect to certain allocations of fishing rights by and between fisheries sectors and through differential treatment with respect to management of particular fisheries. Amendment 80 also is legally deficient in other ways described in more detail below.

8.    FCA is harmed by the Secretary's unlawful actions, and will continue to be harmed unless this Court enters the relief specified below.

---

[1]    MSA Section 1884 was added in a comprehensive amendment to the Act through the Magnuson Stevens Reauthorization Act of 2006, Pub. L. No. 109-479, 102 Stat. 3575 (Jan. 12, 2007) ("Reauthorization Act").

**COMPLAINT AND PETITION FOR REVIEW – Page 2**

## PARTIES

9.      Plaintiff The Fishing Company of Alaska, Inc. is a Washington corporation that operates six catcher/processor vessels participating in the BSAI groundfish fishery.  FCA was formed in 1985 and is entirely dependent on the North Pacific groundfish fishery, and its trawl component in particular.  The company has, through its officers and representatives, been involved in the management of this fishery since its inception, participating in North Pacific Fisheries Management Council ("Council") meetings and commenting orally and in writing to the Council and NMFS on matters generally relating to the management of the BSAI groundfish fishery and, specifically, on the development of the Rule.

10.      Defendant, the Honorable Carlos Gutierrez, is the Secretary of the Department of Commerce.  Defendant, by and through his designees at NOAA and NMFS, undertook the illegal and unauthorized actions which are challenged in this case.  Secretary Gutierrez is sued solely in his official capacity.

## SUBJECT MATTER JURISDICTION

11.      This Court has subject matter jurisdiction pursuant to 16 U.S.C.  § 1855(f) (the MSA's judicial review provisions); 5 U.S.C.  § 611 (the Regulatory Flexibility Act's ("RFA") judicial review provisions); 28 U.S.C § 2201 (the Declaratory Judgment Act); and 5 U.S.C.  §§ 701-06 (the Administrative Procedure Act's ("APA") judicial review provisions).

12.      This Court also has jurisdiction pursuant to 28 U.S.C.  § 1331, which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."

13.    This action is timely under 15 U.S.C. § 1855(f), because it has been brought within thirty days of the September 14, 2007 promulgation of the Rule. *See* 72 Fed. Reg. 52668 (Sept. 14, 2007).

## VENUE

14.    Venue lies in this Court pursuant to 28 U.S.C. § 1391(e). The Defendant Secretary of Commerce is an officer of the United States.

## FACTUAL ALLEGATIONS

**A.    Nature of the Bering Sea/Aleutian Island Groundfish Fishery**

15.    FCA owns and/or operates catcher/processor trawl vessels that participate in the BSAI groundfish fishery.

16.    Groundfish is a generic name for a wide variety of species which live at or near the ocean floor, and which FCA harvests using trawl gear that is towed near and along the ocean bottom.

17.    Groundfish fishery is generally a mixed species fishery because many of the stocks of fish cohabitate in various locations in the BSAI, although some stocks, such as Pacific Ocean perch and Atka mackerel, aggregate in large numbers for more directed targeting. At different times of the year and even within a single trip, FCA can harvest and process a diverse array of fish such as those alleged above, as well as yellowfin sole, rock sole, rex sole, arrowtooth flounder, Pacific cod, and many other species.

18.    No species harvested by FCA in this fishery, whether kept and sold or discarded as bycatch due to lack of markets or because they are required to do so by law, is subject to overfishing (*i.e.*, subject to an unsustainable rate of harvest) or is overfished (*i.e.*, overall stock size lower than long-term sustainable levels). Harvest levels strictly are controlled through

**COMPLAINT AND PETITION FOR REVIEW – Page 4**

mandatory quotas, which, with support of FCA, are set at very conservative levels to ensure long-term sustainability of the resource.

### B.    Nature of FCA's Fishing Operations and Structure of Industry

19.    FCA operates six of the larger vessels in the fishery, each exceeding two hundred feet in length.  FCA's vessels can each hold approximately 80 to 100 tons of finished product, with production capacity of about 175 tons of fish per day.  FCA has fewer than five hundred seasonal, part-time, and full-time employees.

20.    FCA primarily harvests Atka mackerel, yellowfin sole, rock sole, and rockfish in a very high-volume fishery.

21.    FCA is dependent on continued access to these healthy and sustainably managed stocks.

22.    FCA's vessels are part of fleet often referred to as the head-and-gut trawl catcher/processor ("H&G CP") trawl fleet.  The processing operations undertaken by FCA are largely limited to gutting the fish, removing their heads, and freezing the product.  The product is mainly transferred at sea to transport vessels at designated locations, for further processing and ultimate consumption in foreign and domestic markets.

23.    The H&G CP sector occupies a unique niche among BSAI fisheries, producing a wide variety of high quality food fish products for markets that no other sector in the fishery serves.

24.    The H&G CP sector is also commonly referred to as the "Non-American Fisheries Act" trawl catcher-processor fleet to distinguish it from a class of vessels specifically identified in the American Fisheries Act ("AFA"), P.L.  105-277, div.  C, title II, subtitle I, sec.  211, 112 Stat.  2681, 2681-616 (October 21, 1998).  The AFA granted certain named vessels exclusive

**COMPLAINT AND PETITION FOR REVIEW – Page 5**

rights to harvest North Pacific pollock, while capping and limiting the amount of other groundfish species those named vessels could catch.

25.    For their part, AFA trawl catcher/processor vessels tend to be larger than the H&G CP vessels, conduct much more sophisticated processing operations at sea, such as making filets and processed products like surimi (imitation crab), and fish meal for aquaculture and agriculture purposes from small pollock and non-pollock groundfish.

26.    The North Pacific groundfish fishery also includes smaller trawl catcher vessels that do no processing, some of which also are included in the directed pollock fishery under the AFA and a very few of which are not.  These vessels deliver their fish to shore-side processing companies or at-sea processing-only vessels, or "motherships," which process fish products and fish meal from the waste.  The former vessels are part of the "AFA sector," while the latter are referred to in the Rule at issue as the "trawl limited access sector."

C.    **Communities Served by FCA**

27.    FCA's vessels are homeported in the port of Seattle.  FCA's corporate headquarters also are located in Seattle.

28.    On an annual basis, however, its vessels spend the vast majority of their time fishing in the BSAI, obtaining fuel, food, water, sundries, emergency repair work, and other goods and services in various Alaskan fishing communities, primarily Dutch Harbor and Adak, Alaska.

29.    The State of Alaska assesses a landing fee on all fish sold by the H&G CP vessels in Alaskan waters, which is where virtually all, if not all, such sales occur.  Under Alaskan law, tax revenues generated from such sales are shared with the communities to which the sales are attributed.

**COMPLAINT AND PETITION FOR REVIEW – Page 6**

**D.    Amendment 80's Development, Purpose, and Provisions**

30.    The Defendant Secretary, by and through his designees at NMFS, is responsible for managing the BSAI groundfish fishery under the MSA in conjunction with the Council.

31.    The Council is one of eight regional management councils established under the MSA to recommend fish conservation and management measures to the Secretary.  16 U.S.C. § 1852(a); *see also id.* §§ 1853, 1854.

32.    The Council actively has sought to reduce bycatch, minimize waste, and improve utilization of fish resources in the BSAI groundfish fishery and has recommended to NMFS (and NFMS has approved) numerous measures to meet these goals over the past several years.

33.    Most recently the Council adopted the program at issue, which implements Amendment 80.

34.    The stated purpose of the rule is to "increase resource conservation and improve economic efficiency for harvesters who participate in the BSAI groundfish fisheries." 72 Fed. Reg. at 52668.

35.    More specifically, Amendment 80 is designed to: (1) improve retention and utilization of fishery resources; (2) allocate fishery resources among BSAI trawl harvesters; (3) establish a Limited Access Privilege Program ("LAPP") for the H&G CP trawl catcher/processors; and (4) limit the ability of H&G CP trawl catcher/processors to expand their harvesting capacity into other fisheries not managed under a LAPP.  *Id.*

36.    The Capacity Reduction Program ("CRP"), section 219 of the Consolidated Appropriations Act, 2005, P.L.  108-447, 118 Stat.  2809, 2886 (Dec. 8, 2004), created the eligibility criteria for participation in the non-AFA trawl catcher/processor, or H&G CP, sector. *Id.* (a)(7). The statutory definition and delimitation of the H&G CP sector was incorporated into

**COMPLAINT AND PETITION FOR REVIEW – Page 7**

Amendment 80, and the rule at issue refers to the qualifying vessels as the "Amendment 80 sector." 72 Fed. Reg. at 52669. As a result of this law and Amendment 80, only twenty-eight vessels, of which three have been lost or have permanently left the fishery, are qualified to participate in the sector.

37.    FCA's vessels meet the criteria specified in the CRP, and therefore are within the Amendment 80 sector affected by this Rule.

38.    Amendment 80 allocates a specific portion of six non-pollock groundfish species among trawl fishery sectors: Aleutian Island Pacific Ocean perch ("POP"); BSAI Atka mackerel; BSAI flathead sole; BSAI Pacific cod; BSAI rock sole; and BSAI yellowfin sole (collectively, "Amendment 80 species"). The Amendment 80 species are allocated between the Amendment 80 sector and all other BSAI trawl fishery participants (*i.e.* those not in the sector) (referred to as "the BSAI trawl limited access sector").

39.    Amendment 80 also provides, consistent with the Reauthorization Act and other law, for a 10.7 percent allocation of each of these species to entities known as "community development quota" ("CDQ") groups, *see* 16 U.S.C. § 1855(i), and allocations to the AFA sector and others as incidental catch in their directed pollock and other fisheries.

40.    Each year, Amendment 80 will allocate an amount of Amendment 80 species available for harvest, called the initial total allowable catch ("ITAC"). The ITAC represents the total annual allocation of the Amendment 80 species to the H&G CP sector, after accounting for the 10.7 percent granted to the CDQ groups and the incidental catch needs of the other sectors. Also, each year under Amendment 80, each qualifying H&G CP sector vessel is eligible to receive its own specific, pre-determined allocation of the ITAC for each Amendment 80 species, along with certain other fish allocations.

**COMPLAINT AND PETITION FOR REVIEW – Page 8**

41.    Under Amendment 80, the H&G sector will be permitted to form cooperatives to pool and collectively fish their Amendment 80 allocations on the condition that they be comprised of at least three legally separate entities and nine individual Amendment 80 license holders with an allocation under the plan.

42.    As mentioned, only certain named vessels are allowed to fish in the H&G CP fishery, and each of these vessels must have a permit, known as a "license limitation permit" ("LLP") (so-called because, as the name implies, one had to qualify for the permit based on certain criteria and no new entrants are allowed to fish in the BSAI limited access fisheries unless they purchase existing permits or qualify for other exceptions, such as for small, Alaska-based vessels). That LLP must also be endorsed for the BSAI non-AFA trawl catcher/processor fishery. Under Amendment 80, once the LLP is "placed" or associated with an Amendment 80 vessel, and an Amendment 80 quota share ("QS") is applied for and associated with the vessel, then the permit, QS, and vessel all become linked inextricably and cannot be transferred separately or used in any other fishery.

43.    One exception to this no-transfer/use rule applies to the three LLPs that qualify under Amendment 80 because they were associated with vessels that qualified for the H&G CP sector under the CRP, but were lost. In those cases, and for any other qualified Amendment 80 vessel that sinks or irrevocably leaves the fishery (for example, is sold overseas with a proviso that it can never be documented in the United States again or is reduced to scrap), the landings can be associated with the LLP, and that permit can participate in a cooperative, so long as it is harvested by an Amendment 80 qualified vessel.

44.    The other "exception" is for vessels that participate in a cooperative. Under the cooperative format, not all member vessels need be utilized to harvest the QS, but member

**COMPLAINT AND PETITION FOR REVIEW – Page 9**

vessels can fish others' allocations or those associated with a member LLP that has an allocation. That is the advantage of belonging to a coop – specifically, that the most efficient vessels for a particular fishery can be utilized to catch the particular Amendment 80 species.

45.    Cooperatives jointly share the total allocation of all its members' QS and are required to ensure that this allocation is not exceeded. Also, compliance with the Amendment 79 groundfish retention standard is met on an aggregate basis, which helps vessels with high discard rates comply with the Rule. Another benefit is that since the coop has an exclusive QS, its participants may take the time to harvest their allocations without fear of being preempted by others, which can help them manage bycatch.

46.    Finally, cooperatives enjoy the benefit of possible "rollovers" of unutilized allocations of Amendment 80 species from the BSAI trawl limited access sector.

47.    Amendment 80 vessels that are unable or unwilling to join a coop are placed in the Amendment 80 "limited access sector." These vessels bring into the Amendment 80 limited access sector their QS, which is pooled for all vessels in the sector. However, they do not enjoy the right to harvest exclusively the fish they bring into the sector. Rather, in this sector, the "race for fish" continues, and NMFS manages the fishery as it does currently, except that with fewer vessels, its projections of when the smaller quota shares will be met must necessarily be more conservative. That is to say, there is a high risk that the Amendment 80 limited access sector will be shut down prior to harvest of the full share of its allocation due to precautionary judgments about when the quotas will be met.

48.    None of the benefits of the cooperative sector, such as the ability to pace one's harvest to avoid bycatch or receive rollovers from the BSAI trawl limited access fishery, accrue to the Amendment 80 limited access sector.

**COMPLAINT AND PETITION FOR REVIEW – Page 10**

49.    Also allocated is an annual amount of so-called crab and halibut "prohibited species catch" ("PSC").  Amendment 80 sector participants are not entitled to retain halibut or crab species because an economic decision was made to allocate catches of these species to other groups of fishermen.  However, the concept of PSC recognizes that these stocks are taken in conjunction with the BSAI trawl groundfish fishery, as halibut and crab occupy the same ecological niche as Amendment 80 species.

50.    The PSC allocation is designed to allow trawl vessels to harvest a fixed amount of halibut and crab stocks, but also to provide a disincentive to target them.  This is accomplished by disallowing their retention and sale and, more pertinently, by providing that once a sector's PSC allocation for halibut has been met, all directed fisheries in which that species is incidentally taken must shut down whether or not the fishery's allocation of directed fish stocks has been taken.  Meeting crab PSC limits leads to area closures.

51.    Amendment 80's stated goal is to allocate crab and halibut PSC to the BSAI trawl limited access and Amendment 80 sectors based on past PSC use.  However, despite past PSC use, the Council explicitly reduced the amount of crab and halibut PSC assigned to the Amendment 80 sector in order to leave fish "in the water."

52.    Furthermore, just as with allocations of QS as between the Amendment 80 cooperative sector and Amendment 80 limited access sector, the allocation of PSC between these two sectors is subject to the same set of advantages and disadvantages.  That is to say, those in the Amendment 80 cooperative sector receive PSC unused by the BSAI trawl limited access sector, while the Amendment 80 sector will not.  Moreover, vessels in the cooperative sector will be better able to manage their PSC use, while those in the Amendment 80 limited access sector risk getting shut down if others in the sector catch PSC at too high a rate.

**E.    Specific Issues Implicated by Amendment 80 Causing FCA Harm**

**1.    Allocations of PSC to the Amendment 80 Sector Are Inequitable**

53.    With respect to the PSC issue, the Amendment 80 Environmental Assessment/Regulatory Impact Review/Final Regulatory Flexibility Analysis ("Amendment 80 EA"), *available at* http://www.fakr.noaa.gov/sustainablefisheries/amds/80/earirfrfa0907.pdf, shows that the H&G CP sector, and only this sector, is being required to reduce its allocation of halibut and crab PSC. *See, e.g.,* Amendment 80 EA at iii, 207. There is a recognized risk that this requirement will leave the sector unable to harvest its full allocation of Amendment 80 species, even though halibut stocks – the one fully utilized PSC species – are healthy and abundant.

54.    Moreover, as shown on Table 35 to 50 C.F.R. Part 679, 72 Fed. Reg. at 52741, Amendment 80 steadily and significantly reduces the apportionment of halibut PSC in the BSAI to the H&G CP sector, beginning in 2008, by fifty metric tons a year for four years. Meanwhile, the apportionment of halibut PSC to the BSAI trawl limited access sector remains the same. None of these reductions account for the actual allocations to the H&G CP sector of Amendment 80 species that will be made in those years, as other alternatives considered in Amendment 80 did.

55.    Allocations under the program are mutually exclusive. That is, allocations made to one sector are not subject to harvest by participants in the other fishery sector except under one condition: fish that are allocated to the BSAI trawl limited access sector and projected to be unharvested, at a point late in the fishing year, may be reallocated to the Amendment 80 sector cooperatives. The limited scope of such a reallocation may singularly disadvantage vessels that

are unable to find the requisite number of entities and vessels with which to coop, an issue taken up in the next section.

56.    Furthermore, on strikingly similar grounds (*i.e.*, an inadequate allocation of halibut to the H&G sector, complete with an over-allocation to other sectors relative to historic use with respect to the Pacific Cod fishery), NMFS recently held such an allocation to violate: National Standard 1, requiring the attainment of "optimum yield" from the fishery "on an ongoing basis," because it was unlikely that the PSC allocation would allow the sector to harvest its allocation; National Standard 4, requiring fairness and equity in allocations, because the allocation to other sectors was higher than historical use; and National Standard 9, requiring practicable reduction in bycatch, because over-allocation to other sectors could lead to incentives not to minimize PSC use.  72 Fed. Reg. 50788, 50792 (Sept. 4, 2007).

## 2.    Amendment 80 Cooperative Formation Rules Singularly Disadvantage FCA and are Based on Improper Considerations

57.    The provisions requiring that a minimum of three unique entities and nine vessels or Amendment 80 LLP licenses with QS are necessary to form a cooperative, coupled with the fact that FCA has so far been locked out of all possibilities of finding partners with which to form a cooperative, conspire to likely leave FCA with the only option to participate in the Amendment 80 limited access sector.

58.    However, there is no record basis for the decision to require three unique entities, or any rational basis upon which to require nine vessels or LLPs, as a predicate to coop formation.

59.    Indeed, when devising a similar plan for the harvest of BSAI rockfish, Congress required that cooperatives could form with as few as two vessels. *See* 72 Fed. Reg. 37678 (July

**COMPLAINT AND PETITION FOR REVIEW – Page 13**

11, 2007). Under this program, FCA was able to form a cooperative among its own vessels, and enjoy the benefits, described above, associated with cooperative management systems.

60.    In the present case, the Council's decision to set such a high standard for cooperative formation – which would lead to, at most, three cooperatives, although only one will, in fact, be formed – was made specifically to prevent FCA from following the same course it took under the rockfish cooperative program. That decision lacks a solid, scientific and record basis.

61.    Thus, FCA will be forced to forgo the benefits of belonging to a cooperative and realizing the benefits associated with the same.

62.    Furthermore, this scenario opens the door to the possibility, which either will or will not come to pass by the start of the fishing year in 2008, that a vessel with very low allocations of Amendment 80 species not be included in a unitary cooperative formed by the rest of the sector, and, instead, strategically be placed into the Amendment 80 limited access pool to become a new entrant in the Atka mackerel and Aleutian Island Pacific Ocean perch fisheries which are the bread-and-butter of FCA's operations. FCA has, respectively, a fifty-eight and fifty-three percent allocation of the Amendment 80 sector's entire allocation of these two species, due to its focus on these low-value, high-volume fisheries.

63.    However, as mentioned, in the Amendment 80 limited access sector, FCA has no claim on these allocations, if it cannot form a cooperative. Thus, the interest in these fisheries FCA has accrued through its fishing history, and its limitations under Amendment 80 in terms of alternative fishing opportunities (none), are all at risk due to the illegal criteria selected under Amendment 80.

**COMPLAINT AND PETITION FOR REVIEW – Page 14**

> **3.      Amendment 80 Treats the H&G CP Sector Inequitably with Respect to Pacific Cod**

64.      Amendment 85 to the BSAI Groundfish FMP allocated Pacific cod among all the sectors in the North Pacific, ostensibly based on historical and recent use.  This rulemaking ran concurrently with the development of Amendment 80, and, in fact, the Council voted on Amendment 85's final approval prior to final action on Amendment 80.

65.      Under Amendment 85, published as a final rule on September 4, 2007, 72 Fed. Reg. at 50788, the issue was raised as to the Council's then finalized intent to treat the allocation of Pacific cod to the Amendment 80 sector and *only* the Amendment 80 sector, as a hard cap. *See id.* at 50812 (response to comments 77 and 78).  However, as NMFS correctly noted, Amendment 85 did not have this effect.  Rather, it is the regulations implementing Amendment 80, specified at 72 Fed. Reg. 52716 (50 C.F.R. § 679.2 (defining Pacific cod as an "Amendment 80 species")) and *id.* at 52719 (50 C.F.R. § 679.7(o)(4)(v), (1)(ii) (creating a hard limit on Amendment 80 species for the Amendment 80 cooperative and limited access sectors)), that have this effect.

66.      This is no small matter, because for most of the year, the H&G CP sector may only catch Pacific cod incidentally to its other fisheries.  Indeed, under the Amendment 85 Pacific cod allocation to FCA's sector—13.2 percent, which is much lower than recent use that runs as high as 19 percent—this fishery may be on incidental catch status all year, rather than the previous directed fishery the sector enjoyed in recent years.  The import of the confluence between Pacific cod being treated as a hard cap to the Amendment 80 sector and the fishery being on incidental catch status, is that once the allocation to the sector is reached, or is reached for individual cooperatives or the Amendment 80 limited access sector, *all* of its fisheries are shut down, because cod is harvested incidentally in all Amendment 80 fisheries.

**COMPLAINT AND PETITION FOR REVIEW – Page 15**

67.     By stark contrast, for all other sectors, the allocation of Pacific cod is treated as a "soft cap," meaning that achieving the allocation does not shut down fisheries in which the species is incidentally caught (although directed Pacific cod fishing is prohibited), unless or until the entire total allowable catch is reached.

68.     This is because of the set-aside of the incidental catch allowance that is taken off the top of that total allowable catch (along with the 10.7 percent for CDQ groups) prior to determining the ITAC, as explained above.  This incidental catch allowance is designed to insure that directed fisheries do not get shut down, and all sectors enjoy the benefits of this allowance save for the H&G CP sector.

69.     This is especially damaging to FCA, because the formula for allocating Pacific cod to Amendment 80 LLPs overweights the amount caught in the directed cod fishery – a fishery in which FCA had not participated.  Thus, without the ability to coop with entities with high Pacific cod allocations, FCA stand a strong possibility of not being able to harvest its allocated share of Amendment 80 species.

70.     More generally, the H&G CP sector as a whole is treated inequitably and unfairly with respect to the other sectors in the BSAI.

### 4.     Amendment 80 Creates Unprecedented and Illegal Economic Data Reporting Requirements

71.     On information and belief, for the first time in any council recommended plan, the Council and NMFS have required the disclosure of highly sensitive and detailed business information as a regulatory requirement in Amendment 80.

72.     For instance, Amendment 80 sector companies will be required to provide such information as "[r]ecruitment, travel, benefits, and other employee related costs," "total [fuel] consumption for the calendar year and average fuel consumed per hour fishing and processing,

transiting, and in shipyard," "[c]rew revenue share system used for some processing, all processing, some non-processing, and all non-processing crew," "[a]ll other income derived from vessel operations: tendering, charters, cargo transport, etc.," and "[a]ll other costs related to vessel operations not included in the [comprehensive] preceding list." 50 C.F.R. § 679.94(b)(2),(3).

73.    None of these items are necessary to fulfilling the Secretary's required and authorized duties under the MSA.

74.    FCA and the Amendment 80 sector as a whole, however, will be saddled with enormous costs to produce and provide this information.

75.    Moreover, divulging this information, which is among the most confidential and sensitive competitive information a business can disclose, risks inadvertent or intentional disclosure.  This is a particular risk to the extent that the Council staff has access to such information, given that they serve the Council, which itself is comprised in part of business competitors in BSAI fisheries.

76.    The Secretary unrealistically has estimated that the time it will take to gather and prepare this information is twenty hours per vessel, but the program's costs on the industry have not even been attempted to be estimated.

77.    This data collection requirement is to be enforced by a series of random and scheduled audits of the physical books, records, and offices of sector participants.

78.    Although initially, the costs of these audits is to be borne by NMFS, these costs "might [later] be recovered under a cost recovery program, if these costs are found to be integral to the share-based cooperative program." Amendment 80 EA at 304.  The discretion to seek cost recovery is the Secretary's alone.

**COMPLAINT AND PETITION FOR REVIEW – Page 17**

     **5.**     **Amendment 80 Imposes Costly, Unanalyzed Monitoring and Enforcement Requirements for Which No Alternatives were Considered**

79.     Ostensibly as means to monitor and enforce the cooperative program and allocations proposed under Amendment 80, as well as to enforce the GRS, the Rule at issue implements a series of costly and onerous requirements.

80.     These include the purchase and installation of "flow scales" which continuously weigh the catch of fish as they move from the bin to the sorting areas, and then on to the factory for processing and freezing. 72 Fed. Reg. at 52736 (50 C.F.R. § 679.93(c)(1)). Such scales are estimated to cost approximately $50,000, with installation and other associated costs reaching as high as $300,000 per vessel.

81.     Also required are "observer stations," where government monitors who are paid for by the vessels, sample the catch to determine composition of the species. Two such observers are required at an annual cost of about $82,000 each. *Id.* (50 C.F.R. § 679.93(c)(2)).

82.     The observer must have a "line of sight" into the fish bin or the vessel must be equipped with video bin monitoring, and no more than one operational line can be run at any one time. *Id.* at 52723, 52736 (50 C.F.R. §§ 679.28(i), 679.93(c)(4)).

83.     Finally, as to the immediately pertinent monitoring and enforcement requirements, a vessel may not add fish from a subsequent haul to a fish bin until all the fish from the previous haul has been removed. *Id.* at 52736 (50 C.F.R. § 679.93(c)(1)).

84.     Compliance with these provisions of the Rule results in an astronomical expense above and beyond what FCA originally believed it would incur based on what was presented during the development of Amendment 80. FCA now estimates, based on bids received to make

the regulatory alternations on just one of its vessels, that the total purchase and installation of equipment would be $500,000 or more per vessel.

85.    The reason for these high costs is most of FCA's vessels have dual production lines coming out of its fish bins, with conveyors on the port and starboard sides of the vessels. The bin itself is stainless steel design, which is expensive in itself to alter, designed with an apex in the center of the ship sloping to the lines on either side.  All the equipment, such as the hydraulic hatch mechanism in the bin (that opens the hatch to allow fish to enter from the net on deck) and the sorting bins and cutting equipment immediately forward the bin are located amid ship where the production line is on other vessels in the Amendment 80 and AFA sectors.

86.    Thus, to run only one line, FCA would either have to halve its production by running only one line, or completely redesign its vessels at a cost of up to $500,000 per vessel, based on shipyard estimates.

87.    These economic impacts estimates do not include the financial loss attributable to reduced production caused by not being able mixed the catch from subsequent hauls.  This is a forced inefficiency that Plaintiff projects will reduce productivity by more than thirty percent per year, increasing fuel, labor, and repair costs.

88.    As mentioned above, FCA participates in high-volume, low-value fisheries that require maximum productivity in terms of keeping the fish flowing and the factory operating twenty-four hours daily.  This is especially important when FCA is involved in a race for fish, such as it will be in the Amendment 80 limited access sector.

89.    FCA currently redeploys its net right after emptying a haul, and often the next tow is ready before the bin is clear of the prior haul.  Fish are continuously fed into the bin, subject

only to fish availability and tow times.  The Secretary, however, never analyzed the impacts of the no-haul mixing rule or explored alternatives to its use.

90.     Nor has the Secretary calculated the benefit of the suite of costly measures it has imposed, even though required to do so by National Standard 7.

91.     Finally, the no-haul mixing requirement creates safety concerns that were never analyzed, despite the Secretary's duty to consider the impacts of conservation and management measures "on the safety of human life at sea."   16 U.S.C.  §  1851(a)(10);  *see also id.*  § 1853(a)(9)(C), as amended.

92. Safety issues arise because of the economic imperatives that exist even within the cooperative sector to keep production lines fed.  Thus, in order to maximize efficiency under a no-mixing regime, there is a strong economic incentive to either hold the subsequent haul on deck or tow it closely behind the vessel until the bin clears.  Given that a net can hold up to one hundred metric tons of fish, and hauls of thirty to fifty tons are common, keeping the net on deck can effect stability in shifting seas.  Similarly, towing the net closely behind the vessel creates maneuverability issues – another danger on crowded fishing grounds – while also degrading the quality of fish.

93.     It is no answer to say that hauls can be timed, because they can unpredictably range from minutes to a couple of hours depending on fishing conditions.  Also, other factors influence haul backs, such as snagging the net or the need to break a tow to give right-of-way.

94.     These are the kinds of issues that the MSA requires be considered when developing conservation and management measures.  No such consideration occurred in this instance.

**COMPLAINT AND PETITION FOR REVIEW – Page 20**

**6.    Amendment 80 Imposes Joint and Several Liability on Cooperative Participants in Excess of Statutory Authority**

95.    The provisions establishing cooperative criteria also establish legal requirements and provide a liability scheme.    Specifically, NMFS states that "[e]ach member of the Amendment 80 cooperative is jointly and severally liable for any violations of the Amendment 80 Program regulations while fishing under the authority of a CQ permit." *See* 72 Fed. Reg. 52735 (50 C.F.R. § 679.91(h)(3)(xvi)).

96.    This language is overbroad in that it is subject to an interpretation that all cooperative members will be vicariously liable for all violations cognizable under the MSA that occur on any vessel participating in an Amendment 80 cooperative – a class to which FCA desires to belong – under the auspices of the Amendment 80 program. This would exceed the Secretary's authorization under the MSA and offend notions of due process.

97.    The correct and unobjectionable interpretation of the phrase "violations of the Amendment 80 Program regulations" is that it applies solely to the limited set of prohibitions set forth at 72 Fed. Reg. 52719 (50 C.F.R. § 679.7(o)(4), relating to Amendment 80 cooperatives.

**F.    Basis of Complaint**

98.    FCA brings this action because Amendment 80, promulgated by the Secretary, by and through his designees at NMFS, was done so without adherence to the procedure required by law, is ineffective, inequitable, unconstitutional, and unlawfully burdensome, and will cause impracticable economic hardship to FCA's fishing operations and the fishing communities, which it plays a vital role in supporting.

99.    FCA is harmed and will continue to be harmed by the Secretary's illegal actions.

## COUNT ONE
### (Magnuson-Stevens Act, via APA)

100.    Plaintiff alleges paragraphs 1 through 99 as if they were set forth in full herein.

101.    The MSA provides that a fishery management regulation shall be set aside if it fails to conform with 5 U.S.C. §§ 706(2)(A), (B), (C), or (D). *See* 16 U.S.C. § 1855(f).

102.    The APA, at section 706(2), proscribes agency action that is:

> (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law . . . .

103.    Under that Act, "[a]ny fishery management plan prepared, and any regulation promulgated to implement such plan, pursuant to this title shall be consistent with the . . . national standards for fishery conservation and management." *Id.* § 1851(a).

104.    The regulations implementing Amendment 80 at issue herein represent "regulations," as that term is used in both 16 U.S.C. §§ 1855(f) and 1851(a).

105.    MSA National Standard 1 states: "Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." *Id.* § 1851(a)(1).

106.    MSA National Standard 4 states: "Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; (C) carried out in such a manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges." *Id.* (a)(4).

107.    MSA National Standard 9 states: "Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." *Id.* (a)(9).

108.    Amendment 80 violates National Standards 1, 4, and 9, singularly and collectively, and the APA for, among others, the following reasons:

a.    Amendment 80 steadily and significantly reduces the PSC available to the Amendment 80 sector over time, beginning in 2008, while at the same time keeping the PSC available to the BSAI limited access catcher/processors the same and increasing the halibut PSQ to the CDQ. As a result, the ability of Amendment 80 sector vessels to harvest the BSAI flatfish total allowable catches is severely and illegally limited because flatfish and halibut occupy the same waters, and once the fishery is closed under a lower PSC for halibut, fishing must cease. The only relief from this inequitable scheme under Amendment 80 is the ability for Amendment 80 sector vessels to join a cooperative. The criteria for joining a cooperative under Amendment 80 makes it impossible for FCA to form or join a cooperative. Thus, as structured, Amendment 80 is patently unfair and inequitable to FCA and violates National Standard 4.

b.    Amendment 80, by allocating more PSC to the CDQ groups, increases the bycatch of halibut, a fact that cannot be avoided. As such, Amendment 80 directly violates the mandate in National Standard 9 to minimize bycatch.

c.    Amendment 80 violates National Standard 4 because it is not reasonably calculated to promote conservation of halibut. Ample scientific data exists showing that there is an abundance of halibut in the BSAI with BSAI halibut levels at an all-time high. While conserving the BSAI halibut population is a suspect goal in light of this information in the first place, Amendment 80 actually increases halibut bycatch by keeping halibut PSC bycatch the same for the BSAI limited access sector and increasing halibut PSC bycatch for the CDQ. This paradigm is not a reasoned policy and does not promote the conservation of halibut.

d.    Amendment 80 violates National Standards 1, 4, and 9, singularly and collectively, and is unlawful because it increases bycatch while prohibiting the attainment of optimum yield of BSAI flatfish. Flatfish comprise the largest unharvested biomass in the BSAI. As stated previously, the PSC allocations under Amendment 80 progressively decrease the halibut PSC for the Amendment 80 sector vessels. Because flatfish and halibut occupy the same waters, the effect of a lower halibut PSC allocation in the Amendment 80 sector is an inequitable allocation resulting in the

**COMPLAINT AND PETITION FOR REVIEW – Page 23**

underutilization of flatfish in the BSAI. Thus, Amendment 80 directly opposes the mandates set forth under National Standards 1, 4, and 9 by increasing the bycatch of halibut (as discussed above) and underutilizing the optimum yield of flatfish.

e. Amendment 80 violates National Standards 1 and 4 because it singles out the Amendment 80 sector by treating its allocation of Pacific cod as a "hard cap," through regulations, promulgated at 72 Fed. Reg. 52716 (50 C.F.R. § 679.2 (defining Pacific cod as an "Amendment 80 species")) and *id.* at 52719 (50 C.F.R. § 679.7(o)(4)(v), (1)(ii) (creating a hard limit on Amendment 80 species for the Amendment 80 cooperative and limited access sectors)). Such agency action threatens to, and likely will, prevent FCA and other sector participants from fully harvesting their allocation of the other Amendment 80 species, while the Pacific cod fishery is treated solely as a "soft cap" (*i.e.*, one which does not close a fishery upon attainment of their cod allocation) for all other sectors in the BSAI groundfish fishery. This disparate treatment lacks a rational basis.

## COUNT TWO
### (Magnuson-Stevens Act, via APA)

109. Plaintiff alleges paragraphs 1 through 108 as if they were set forth in full herein.

110. MSA National Standard 2 states: "Conservation and management measures shall be based on the best scientific information available." 16 U.S.C. § 1851(a)(2).

111. National Standard 5 states: "Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose." *Id.* (a)(5).

112. "[A] regulation must be based on concrete analysis that permits the Secretary to 'rationally conclude that his approach would accomplish his legitimate objectives.'" *Fishing Co. of Alaska v. United States*, 195 F. Supp. 2d 1239, 1248 (W.D. Wash. 2002) (quoting *Parravano v. Babbitt*, 837 F. Supp. 1034, 1047 (N.D. Cal. 1993)). Lacking such analysis, a regulation runs afoul of National Standard 2.

113. The criteria for establishing cooperatives under Amendment 80, specifically the requirements for three unique entities and nine Amendment 80 QS permits, set forth at 72 Fed.

**COMPLAINT AND PETITION FOR REVIEW – Page 24**

Reg. 52734 (50 C.F.R. 679.91(h)(3)(ii),(iii)), necessary to form a cooperative are, singularly and collectively, unlawful under the MSA and are arbitrary and capricious within the meaning of the APA for among others, the following reasons:

    a.  They lack a rational, record-based rationale.

    b.  They are not based on the best available scientific information available, as required by National Standard 2, because they were devised for an improper purpose and based on considerations not cognizable under the MSA or other applicable law.

    c.  The regulations violate the National Standards because related to the formation of a cooperatives, they are purely economic allocation and are not related to the conservation of the fisheries.

    d.  They will prevent Amendment 80 sector participants, such as FCA, from being able to form cooperatives, thereby ensuring, as explained above, that the full optimum yield from the fishery will not be attained, as required by National Standard 1, and that bycatch will not be minimized to the extent practicable, as required by National Standard 9.

**COUNT THREE**
**(Magnuson-Stevens Act, via APA)**

114.    Plaintiff alleges paragraphs 1 through 113 as if they were set forth in full herein.

115.    The MSA defines bycatch as "fish which are harvested in a fishery, but which are not sold or kept for personal use, and includes economic and regulatory discards." 16 U.S.C. § 1802(2).

116.    The statutory qualifier "to the extent practicable" in section 1853(a)(11) and National Standard 9 imposes a limit on the extent to which the Secretary can impose costs on the regulated fishing communities in order to achieve bycatch reduction.

117.    MSA National Standard 7 states: "Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication." *Id.* (a)(7).

118.    Magnuson-Stevens Act National Standard 8 requires that:

**COMPLAINT AND PETITION FOR REVIEW – Page 25**

Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

*Id.* (a)(8).

119. The monitoring and enforcement provisions of Amendment 80 violate National Standards 7, 8, and 9, and are arbitrary and capricious for among others, the following reasons:

    a. The monitoring and enforcement measures will impose inordinate and unreasonable out-of-pocket expenses and production inefficiencies that, in the first year, will amount to millions of dollars for FCA, with subsequent ongoing economic losses also in the millions of dollars.

    b. The regulations implementing Amendment 80 are not consistent with National Standards 7, 8, and 9, because practicable alternatives that would have met the Amendment's conservation objectives while minimizing costs and economic impacts were not adequately considered, to the extent they were considered at all.

    c. The Amendment 80 monitoring and enforcement measures generally unnecessarily impose illegal, excessive, and impractical costs; do not provide for the sustained participation of fishing communities; and were developed without a sufficient record basis.

### COUNT FOUR
### (Magnuson-Stevens Act, via APA)

120. Plaintiff alleges paragraphs 1 through 119 as if they were set forth in full herein.

121. Amendment 80 imposes an open-ended joint and several liability scheme for "any violations of the Amendment 80 Program regulations" upon each member of a cooperative. 72 Fed. Reg. 52,735 (proposed to be codified at 50 C.F.R. § 679.91(h)(3)(xvi)).

122. The joint and several liability scheme for cooperatives under Amendment 80 is unlawful and an arbitrary and capricious abuse of discretion for, among others the following reasons:

**COMPLAINT AND PETITION FOR REVIEW – Page 26**

a.  NMFS' stated purpose in establishing this joint and several liability scheme is to ensure that cooperatives and members of the cooperative adhere to regulations necessary to manage the fishery. *See* 72 Fed. Reg. 52697.  Existing civil and criminal penalty provisions of the MSA sufficiently ensure adherence to implementing regulations.  NMFS has provided no rational basis on the record to justify such a wide-sweeping liability scheme as being necessary to achieve the conservation and management goals of the fishery.

b.  The civil liability and criminal penalty scheme for violations of the MSA as set forth at 16 U.S.C. §§ 1855 through 1861, do not authorize NMFS to impose joint and several liability for violations under the Act generally. The liability scheme as proposed in 50 C.F.R. § 679.91(h)(3)(xvi) is vague and overbroad and constitutes an unlawful and impermissible abuse of the statutory authority set forth in 16 U.S.C. §§ 1855 through 1861.

## COUNT FIVE
### (Magnuson-Stevens Act, via APA)

123.    Plaintiffs allege paragraphs 1 through 122 as if they were set forth in full herein.

124.    National Standard 10 states: "Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea." 16 U.S.C. § 1851(a)(10).

125.    NMFS's implementation of the regulatory prohibition on mixing of hauls does not comply with National Standard 10.

## COUNT SIX
### (Magnuson-Stevens Act, via APA)

126.    Plaintiffs allege paragraphs 1 through 125 as if they were set forth in full herein.

127.    The MSA only allows a council in an amendment to "specify the pertinent data which shall be submitted to the Secretary with respect to commercial, recreational, charter fishing, and fish processing in the fishery, including, but not limited to, information regarding the type and quantity of fishing gear used, catch by species in numbers of fish or weight thereof, areas in which fishing was engaged in, time of fishing, number of hauls, economic information *necessary* to meet the requirements of this Act, and the estimated processing capacity of, and the

**COMPLAINT AND PETITION FOR REVIEW – Page 27**

actual processing capacity utilized by, United States fish processors." 16 U.S.C. § 1851(a)(5), as amended (emphasis added).

128.    MSA section 1851(a)(9), as amended, requires that an amendment "assess, specify, and analyze the likely effects, if any, including the cumulative conservation, economic, and social impacts, of the conservation and management measures on, and possible mitigation measures for participants in the fisheries."

129.    The economic data reports and the enforcement system attendant to these reports violate the MSA, and are in excess of the Secretary's statutory authority within the meaning of the APA for, among others, the following reasons:

    a.  The sweeping breadth and depth of economic information is not "necessary to meet the requirements" of the MSA.

    b.  The detailed economic information required under the regulations implementing Amendment 80 and set forth at 72 Fed. Reg. 52738 (50 C.F.R. § 679.94(b)), singularly and collectively exceed the types of information authorized to be requested, and are not of a like kind to the types of information authorized to be collected, by 16 U.S.C. § 1851(a)(5).

    c.  The agency has failed to develop and consider alternatives to the costly data reporting and enforcement provisions in section 50 C.F.R. § 679.94 on fishermen and fishing communities, in violation of 16 U.S.C. § 1853(a)(9) or to minimize the adverse economic impacts and costs of the program in accordance with National Standards 7 and 8.

## COUNT SEVEN
### (Violations of Due Process)

130.    Plaintiffs alleges paragraphs 1 through 129 as if they were set forth in full herein.

131.    The Fifth Amendment provides, "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V.

132.    Amendment 80 deprives FCA of property without due process of law in, among others, the following ways:

**COMPLAINT AND PETITION FOR REVIEW – Page 28**

    a.  By providing for random audits of facilities, commandeering personnel, facilities and records, and potentially foisting the associated costs on regulated entities, in order to enforce the economic data collection requirement, as authorized at 72 Fed. Reg. at 52738 (50 C.F.R, § 679.94(d)(1)) and detailed in Amendment 80 as explained above.

    b.  By and through the Secretary's unlawful coop formation requirements, challenged in Count Two above, which prevent FCA from harvesting its full allocations of fish, and which, by constraining FCA to fish in the Amendment 80 limited access sector, allow other vessels to fish FCA'S allocations of fish.

## COUNT EIGHT
### (Regulatory Flexibility Act, as amended)

133.    Plaintiff alleges paragraphs 1 through 132 as if they were set forth in full herein.

134.    FCA is a "small entity" as that term is employed in the RFA's judicial review provisions, 5 U.S.C. § 611(a)(1), under the size standard recommended by the Small Business Administration's Office of Advocacy. *See* 71 Fed. Reg. 17362, 17371 (April 6, 2006).

135.    The RFA's judicial review provisions, at 5 U.S.C. § 611(a)(1)-(2), allow a small business to seek judicial review of an agency's development and preparation of a final regulatory flexibility analysis ("FRFA"). 5 U.S.C. § 604.

136.    The RFA sets out specific requirements and mandatory elements for preparation of a legally adequate FRFA. 5 U.S.C. §§ 604(a)(2)-(5).

137.    An agency's certification under the RFA, pursuant to 5 U.S.C. § 605(b), that a rulemaking will not have a "significant impact on a substantial number of small entities," also is subject to judicial review pursuant to 5 U.S.C. § 611(a)(1), (2).

138.    Amendment 80's RFA analyses do not comply with applicable decision-making standards because, among other reasons, they fail to consider H&G CP vessels as small businesses; fail to adequately estimate the costs of Amendment 80, particularly the costs of the economic data reporting and monitoring and enforcement costs, on small businesses; and fail to

adequately develop and consider alternatives to reduce Amendment 80's cost on small businesses.

## **PRAYERS FOR RELIEF**

WHEREFORE, Plaintiff respectfully seek an Order of this Court:

(a)    Enjoining the unlawful provisions of Amendment 80;

(b)    Ordering the Defendant to rescind and otherwise nullify those particular regulations implementing Amendment 80 that were not promulgated according to law;

(c)    Declaring, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that the final rules at issue implementing Amendment 80 were promulgated in violation of the Magnuson-Stevens Act, APA, the United States Constitution, and RFA for, among others, the reasons stated above;

(d)    Awarding Plaintiff their costs and attorneys' fees as appropriate;

(e)    Such other relief as is just and proper.

Dated: October 15, 2007                Respectfully submitted,

David E. Frulla
D.C. Bar No. 414170
Shaun M. Gehan
D.C. Bar No. 483720
Daniel S. Blynn
D.C. Bar No. 488934
Kelley Drye & Warren LLP
3050 K Street, N.W. – Suite 400
Washington, D.C. 20007
Telephone: (202) 342-8400
Facsimile: (202) 342-8451

Attorneys for Plaintiff

**COMPLAINT AND PETITION FOR REVIEW – Page 30**

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| The Fishing Company of Alaska, Inc. | Honorable Carlos Gutierrez, in his official capacity as Secretary of Commerce |

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** _____88888_____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____N/A_____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

David E. Frulla
Shaun M. Gehan
Daniel S. Blynn
Kelley Drye & Warren LLP
3050 K Street, NW, Suite 400
Washington, DC 20009
(202) 342-8634

ATTORNEYS (IF KNOWN)

---

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

◉ 2 U.S. Government Defendant

○ 3 Federal Question (U.S. Government Not a Party)

○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

**○ A. Antitrust**

☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**◉ C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☒ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

**○ E. General Civil (Other)**    OR    **○ F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

<table>
<tr><td>

**G.** *Habeas Corpus/ 2255*

☐ 530 Habeas Corpus-General
☐ 510 Motion/Vacate Sentence

</td><td>

**H.** *Employment Discrimination*

☐ 442 Civil Rights-Employment
(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)

*(If pro se, select this deck)*

</td><td>

**I.** *FOIA/PRIVACY ACT*

☐ 895 Freedom of Information Act
☐ 890 Other Statutory Actions (if Privacy Act)

*(If pro se, select this deck)*

</td><td>

**J.** *Student Loan*

☐ 152 Recovery of Defaulted Student Loans (excluding veterans)

</td></tr>
</table>

**K.** *Labor/ERISA (non-employment)*

☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Labor Railway Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**L.** *Other Civil Rights (non-employment)*

☐ 441 Voting (if not Voting Rights Act)
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights
☐ 445 American w/Disabilities-Employment
☐ 446 Americans w/Disabilities-Other

**M.** *Contract*

☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholder's Suits
☐ 190 Other Contracts
☐ 195 Contract Product Liability
☐ 196 Franchise

**N.** *Three-Judge Court*

☐ 441 Civil Rights-Voting (if Voting Rights Act)

---

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

See Attached Addendum

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ N/A   Check YES only if demanded in complaint
**JURY DEMAND:** YES ☐ NO ☒

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐ NO ☒   If yes, please complete related case form.

DATE  October 15, 2007   SIGNATURE OF ATTORNEY OF RECORD _____

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# CIVIL COVER SHEET
# ADDENDUM

*The Fishing Company of Alaska, Inc. v. Gutierrez*

## VI.    CAUSE OF ACTION

This action challenges a rulemaking involving bycatch reduction and fish allocation standards for the Bering Sea – Aleutian Islands groundfish fishery by the Secretary of Commerce, by and through the National Marine Fisheries Service, under the judicial review provisions of the Magnuson-Stevens Act, 16 U.S.C. § 1855, the Administrative Procedure Act, 5 U.S.C. §§ 701-06, the Regulatory Flexibility Act, 5 U.S.C. § 611, and the Declaratory Judgment Act, 28 U.S.C. § 2201.